May it please the Court, Your Honor. Mr. Cleveland, Ms. Bamboza. My name is Morgan Holder. I am appellate counsel for Mr. Maes in this matter. One instruction from Your Honor was to make sure your voice is raised. I've been a little under the weather and sometimes my voice can not be raised as a result. But it is just good to, I like to say, have your thespian or your theater voice and the system will pick you up. I guess these tall ceilings, even though we put in speakers and so forth, sound just tends to kind of disappear. But you're good. Just a brief, I know Your Honor's read the briefs and that thing, but to point out this was a methamphetamine conspiracy matter with several of the co-defendants and one of the critical issues that Mr. Maes has addressed on appeal was the testimony of a witness that was housed at the Stone County Jail with several of the co-defendants. At trial, there was a proffer made whereby this witness was prepared to testify as to the evidence of the co-defendants and testifying in the way that they did from conversations that they had at the jail. The analysis was undertaken pursuant to exceptions to the hearsay rule rather than Rule 613B for just strict impeachment evidence. As all of these co-defendants had testified, they had testified that they had not discussed their testimony or rehearsed their testimony amongst one another at the jail. Eventually, the district court ruled that he would allow testimony insofar as it pertained to what they said insofar as rehearsing their testimony, but not as to why it was said. In other words, he would not allow testimony in the sense of we were going to say this to have our time reduced or we were going to say . . . It seems like a trial court in the midst of it, a balance, so to speak, between not having just full bore all the testimony. I know what you've argued in the brief, but I mean honing in on sort of what's the reversible error. I know you would have preferred, not you, but client, to have had it a different way, but I mean what's the reversible error here? I think in this case, Your Honor, given the fact that the testimony was to be elicited as to impeaching the accomplices themselves, the co-defendants themselves in this case, makes it even more important that he's entitled to a full-scale cross-examination on impeachment as to motives, bias, reasons they testified the way that they do. I think it's the jury, for instance, if they hear Mr. Minor testify that I overheard these people saying they were going to make up the story, put meth in this guy, and they told each other, one another, that they were going to do it so they could get their sentences reduced because throughout the either direct or redirect of the various co-defendants, they all testified that they were not promised any sentence reduction, that type of thing, as a result of their plea agreements, and Mr. Minor was prepared to testify that they were discussing the exact opposite, and if the jury hears something along those lines as to why they're testifying the way they do, I think it certainly goes towards their credibility in a case where they had to believe these people to convict Mr. Mays. What's your best case that supports that line of thought? There is a United States v. Lay and United States v. Sisto, which Lay cites Sisto, deals with, I would say, pretty much the exact issue we're speaking of here. Now, on the front end, I will freely admit in the Lay opinion that the court, they just said it was harmless error in that case. They said the district court erred in not allowing him to impeach this witness as to his bias and his motives. However, given the other evidence in the record, it was harmless error. Well, that's why I started you off with going to the nub of it, of arguably not error, but if error, harmless error given the sort of, not speed, but the nature of the trial and you're going to have people testify, there's going to be impeachment, so there's some bias. Well, what's your best case for reversing? But, you know, you've responded. I understand. I think it's important to note in this case, there was no direct evidence of Mr. Mays' involvement in any transferring, distributing methamphetamine. Everything was based on testimony. There was no control by, there was no handwriting, example or analysis of the packages that were sent to Mississippi. Even after they discovered that this activity was going on, there was never any attempt to contact him, either through the girlfriend of the co-defendant, Roland Jackson. Her name was Amanda Turner. She had the cell phone that was, the extraction was produced at trial, and that type of thing. There was testimony that Mr. Mays' girlfriend, his telephone actually belonged to her, which was confirmed by his girlfriend herself. As a matter of fact, I believe that cell phone still belongs to Miss Ryder, is her name. There was testimony that a young lady by the name of Amanda Turner was the best friend, or a very good friend, of Mr. Mays' girlfriend, and that was the account in which some of these deposits were coming in towards the end of this alleged conspiracy with Mr. Mays, and she was the best friend of Mr. Mays' girlfriend. And part of the defense theory in this case was that somebody else was involved other than Mr. Mays. He was dealing with marijuana. He freely admitted that. And that somebody else was involved, but the issue of methamphetamine. And I think that when you combine all this together, there's no direct evidence linking Mr. Mays, other than the testimony of these co-defendants, given the fact that there is no controlled buy, there is no handwriting analysis on any of these packages. There were other people involved. The co-defendants admitted to having a relationship with Miss Ryder, who was Mr. Mays' girlfriend, that, you know, any further impeachment of these co-defendants was critical as to the motives as to why they were testifying the way that they did. And I think it becomes even more critical in a case like this, given the fact that Mr. Mays received a sentence of life imprisonment. Now, we have the somewhat unusual posture here that Mr. Mays testified, right? He did, Your Honor. So I take it in his direct testimony, he was able to say more than might be the case, obviously, where the defendant doesn't take the stand. Would that be true? I haven't read his testimony. He did testify, and he did testify as to those facts, that it was her phone, she allowed him to use it, but they both used it. He did freely admit to sending a lot of the text messages between the parties, but his contention was that he only dealt with marijuana. And there was admissions from at least one, I think two, co-defendants that Mr. Mays dealt with marijuana, that marijuana was sent to Mississippi. That's not in dispute. And Mr. Minor was prepared to testify that, you know, these people were saying, we've got to get away from the marijuana and focus on ICE. They called it ghost dope. Did the jury hear any testimony regarding the three fellow inmates who testified as to their lower sentences or reduction of sentences, or whether that was their purpose? They testified insofar as what the plea agreement said. I think the counts of their conditions were capped at 20 years. Uflin received a sentence of less than 10 years. One of them, I believe, received 20 years, and one of them just below 20 years. So, yeah, they did hear testimony as to what their sentences were. They also heard testimony that, you know, they believed that potentially their sentences could be reduced as a result of their testimony. So the jury did hear that part? That's correct. And we don't have a jury charge issue, so presumably the trial judge gave a Fifth Circuit patent instruction vis-a-vis co-defendant testimony, et cetera? Yeah, I think all the jury instructions were patent instructions. Now, in another issue we have, Your Honor, is the conviction as to, and it kind of goes hand-in-hand with the other facts that we were just discussing, the conviction for the count where there was a deposit, in fact, I think it was February 23rd, 2017. The government's theory was that, you know, this amount was deposited from, you know, kind of the same scheme or plan as the other deposits that were made. However, Ms. Turner testified that she never spoke to Mr. Mays directly. She never texted Mr. Mays directly. Her instructions were I would get a text message from her boyfriend, Mr. Jackson, one of the co-defendants, as to a bank account number or an amount of money to go deposit at a bank. Well, as to that deposit, Mr. Jackson had already been arrested two weeks, over two weeks before that. Her testimony was clear that she never did any of this without his instruction. That cell phone was already confiscated. There's no indication whatsoever that that deposit came from Ms. Turner. You know, it's undisputed that Mr. Mays was dealing marijuana, but to prove that count, it had to be in conjunction with methamphetamine. The deposit was made into the account of Jasmine Chavez, but she was not there. She did not testify. So, there's absolutely no evidence at all that that February the 23rd deposit had anything to do with methamphetamine. We don't really know who it came from. And it further bolsters Mr. Mays' theory that, you know, Ms. Ryder and or other individuals were somehow complicit in some of the activity with methamphetamine. So, Do you want to talk about some of your sentencing issues since we still have a little time? I know there was, I was alerted this morning that a Supreme Court case was entered on, I think it was Friday, maybe of last week. And I haven't had a chance to read. I literally just found out about it this morning. But my understanding is that it basically, if you raise any type of argument, disagreeing with the sentence imposed, whether it's requesting a variance or asking for a specific sentence, then that is, that justifies, that preserves your argument for appeal. Here, Mr. Crosby, I believe the court interpreted his, his argument as a request for a variance and therefore we would argue that it's preserved for appeal. Now, insofar as the substance of reasonableness of this, Mr., I believe Mr. Mays was in criminal history category four. But a lot of that was due to things like driving on a suspended license and that type of stuff. He did have one prior felony when he was 19 years old. At the time of sentencing, I believe he was 29. And, you know, if nothing else, just simply going to the similarly situated defendants, and I understand their exposure was capped at 20 years pursuant to a plea, but Mr. Mays is 29. He received a life sentence for a, you know, what I would contend is a non-violent crime, drug crime. It's, you know, the average life expectancy is looking at, you know, 75 years in jail until he passes away. Was his life sentence based on purely calculation under the guidelines or three strikes? There was, the guideline range was, the base was 38. He received a two-level enhancement for importation, four-level enhancement for leader organizer, and then an enhancement for obstruction of justice, which, you know, I've argued that in the brief as well that we disagree with several of those I don't believe Mr. Crosby, I'm an appellate counsel, I'm not a trial counsel, but I do not believe Mr. Crosby filed any written objections to the drug quantity. My understanding reading the record is that he, when he says he is not objecting the pre-sentence report, that he was not objecting to what the actual probation office calculations referencing the guidelines were correct. So, in other words, it's over 90,000 kilograms, base level 38. He was saying, yeah, that's right. Not necessarily that he agreed that all of these drugs were attributed to Mr. Mays. Did he make any specific objections as to why I could not find any of those in the record? Out of an abundance of caution, I argued that in my brief. Well, there's no doubt it's a hefty sentence, a life sentence here, but it doesn't look like . . . it looks like the court had the guidelines, the enhancements, and there are no issues in there of, you know, the judge disallowing, you know, anything to be put on, et cetera, et cetera. I mean, the calculation and on and on. Even though he says all he did was marijuana, I'm assuming he was not a very persuasive witness on the stand. And so, it's a lot of time. It is. And, you know, a lot of the reason that we argued the way we did in our brief as to sentencing was to show that there were some legitimate arguments that some of these enhancements were, you know, applied improperly. Like, for example, the organizer, the leader, there's no question that the defendant, Mr. Uflin, was the man who got all this started. He and Mr. Denham, in conjunction with one another, he had the cartel connections in California. There was at least three references to different names with cartel connections in California. All of those were strictly related to Mr. Uflin. It didn't have anything to do with Mr. Mays. Well, you'll have some time to hit it when you come back on rebuttal, but I'm pretty sure the government's going to say, as they have in their gutless evidence, tying these shipments to Mr. Mays and so forth, and you know our case law on leader-organizer and kind of what the standard is, and it can be more than one leader-organizer and so forth. So, I guess to say, be prepared to kind of push back on why, as I like to say, where's the reversible error, not just error, given what our case law says about identifying leader-organizer in the scope of this thing, it can be more than one, et cetera, et cetera, to sort of push back or help me understand a little bit better where we would find the error in it as opposed to maybe it could have been different. You follow me? Yes, sir. All right. Thank you, sir. You've reserved your rebuttal time. All right, Mr. Cleveland. Good morning, Your Honors. Gaines Cleveland for the government. I'm here with trial counsel Kathleen Van Buskirk. May it please the Court. Let me turn first to the 813B issue, which Mays he was not allowed to cross-examine fellow inmate Fabian Minor about the cooperating defendants motive for attributing that to him. But Mays was allowed to offer Minor's testimony that these cooperating defendants were trying to get their time cut and were tailoring their stories. Minor testified that Michael Denham was going to put a lot of ice on Mays and that marijuana wouldn't do anything. That's from record at 6989 to 91. In contrast to what Mr. Holder says, none of the three was asked about the reason for their supposedly having tailored their testimony with their co-defendants. This was a question Judge Wiener asked and there was simply no two. It goes through the citations that Mays pointed the court to and you will not find what he says is there, which is they were not asked about the motive for their testimony. Now, defense counsel argued that in summation. He argued that there was in fact a motive that all of them had based on their cooperating plea agreements, which were made a part of the record. And he said, in summation, the cooperating defendants were going to put meth on him in order for us to get our sentence reduced. That's record at 7062. So you've got defense counsel making this argument. Not any evidence to support it, but there was, other than perhaps an inference, but there was an argument already that he made. He obviously thought the evidence was sufficient for him to make that argument. So with none of the defendants, with having been, co-defendants having been asked about the reason for supposedly cooking up their testimony, there was no denial that would permit the extrinsic evidence of motive that is necessary in order to be able to trigger 813B. Absent a prior inconsistent statement, extrinsic proof from Mayer was not admissible under Federal 11613B. The cases that Mr. Holder cites, in fact, Jeff, you asked him what's your best case. He cited you to the Sisto case. That case does stand for that same proposition, which is you have to have an inconsistent statement in order to be allowed to bring in the extrinsic evidence. And in our brief, at page 24, we refer the court to U.S. against Hale, which is a per curiam in which, Judge Stewart, you were on the panel. There the court emphasized that without a denial of making the statement or a showing of inconsistency, such a statement cannot be used to impeach the witness's credibility. That's from 685 F. 3rd and 539. In any event, as I say, Your Honors, precluding Mayer from testifying about the motive for the cooperating defendants to tailor their testimony made no difference because their incentive could be inferred from the cooperating plea agreements. The lawyer argued it. And of course, there's overwhelming evidence of guilt in this case. Mr. Holder says there's no direct evidence. Well, you have packages being sent from California, actually to Slidell that were then delivered to Mississippi. Governor exhibits 1A and 12A with the lab reports showing this was not marijuana. It was methamphetamine. And of course, you have the flow of the money going in the other direction, going to Mays. So we'd submit that regardless of the testimony of Fabian having been limited, there was plenty of other evidence that he could rely on. And of course, the defendant took the stand. Now, as to Count 9, as to which Mays challenges the sufficiency of the evidence, Mays points to Roland Jackson's having been arrested on February 23, 2017, and the deposit to the account of Jasmine Chavez that's charged in Count 9 has occurred before that deposit. The jury could reasonably have inferred that the pattern that's shown in what we've produced as Table 2 to our brief on page 11, that this deposit to Chavez's Wells Fargo account from Gulfport was one of a series in Government Exhibit 60 that were initiated after Chavez's name was texted to Jackson's girlfriend, Amanda Turner, who conducted the other transactions. Asia Ryder, who was Mays' girlfriend, testified that she was aware of Chavez's account having money transferred to it by Mays. And you'll find that in the record at 6751. And of course, Mays, as Judge Stewart pointed out, he testified, he acknowledged that the evidence showed a text from his phone to Denham, the co-defendant, with Chavez's account information in it. That's record at 6952. But the most obvious explanation for the February 23, 2017 deposit to Chavez's account from the Courthouse Road branch in Gulfport, the same branch, is that it was related to the earlier transactions. This is strong circumstantial evidence, a pattern going, money going from this same Gulfport, Mississippi branch to California in silver amounts. The money was deposited at the Wells Fargo account in Gulfport and then a withdrawal close to the full amount the very next day. And the jury certainly had a reasonable basis to infer the transfer, that this transfer was related to the other transfers. Now, as to sentencing, let me first touch on the standard, I believe, Mr. Holdren intimated that the Court should consider the, what I believe he's referring to is the Holgren decision of the Supreme Court, Holgren-Hernandez, that came down on the 26th of, last month. And that's a preservation issue. That's a preservation issue. And that decision, I don't think it did anything to disturb the Court's previous decision, Molina-Martinez, which said that failing to object at all to a procedural error, for example, the District Court's miscalculation of the guideline range will subject a procedural challenge to plain error review. So you still have plain error review, but there's absolutely no objection to the guidelines at all. There's no basis for the District Court to have an opportunity to make a factual finding. And that's what this Judge Ozerton was deprived of. Does the guideline sentence, the guideline provision, under all of these ups and downs and sideways, give an option less than life? It was a level 38. And given the criminal history, I'll have to, I may have to get, I'm not sure I remember the level. Okay, we can check it. We can check it. But it's, I can tell you that this case was very, very much driven by the extraordinary amount of Table 3 to the, to our brief, which is page 47. This is just basically a way to sum up what's in the precedence report. The total amount of the meth sieved was 88,180 converted kilograms, just under the 90,000 kilogram threshold for level 38, which is the highest base offense level under the guidelines, under TD-401. This is at page 47 of our brief. So we go through the two seizures, government exhibit 12A and 1A, the first one on August of 2016, just under three kilograms from Keyon Hawkins, and the lab report proved that that is being meth. He testified he got it from Mays. Hawkins was not even in the same jail cell with the co-defendants who supposedly cooked up the idea of pinning all this on Mays. He was being housed somewhere else, and that's corroborated by the other defendant, Uffland. In February 2017, it was just under two kilogram parcels sent to Roland Jackson. Denham had texted Mays the address in Slidell to send the meth to, that was the record, to 861, and of course there were contemporaneous transfers of money. So you have only... What was his prior crimes, if any? He had a lot of, not much in the way of a drug history. He had some crimes of failure to appear and that sort of thing, but not a serious... No federal drug conviction. You know, I don't want to get out of the limb on that. For some reason, I did not refresh my recollection on his criminal history because I didn't think it was an issue on appeal. When he acknowledged he just dealt marijuana, I mean, what did that mean? I mean, he took the stand. So in his direct, or in the cross, was it extracted that he had been convicted of marijuana violations, et cetera, et cetera, or sort of dabbled in marijuana as in uses? I took it to mean that he had some convictions or something to which he acceded, and if he took the stand, I assume he was wide open for you or a trial counsel. He certainly had a record of marijuana dealing, including the arrest that was challenged to three pounds that he was caught with. That arrest came into play in this trial because when he was arrested out in Oakland with the three pounds, he also had a receipt for a shipment to Slidell, so we were offering up that proof. But what was the shift? I mean, his take is, I've just dabbled in marijuana, you know, but I'm no big-time kingpin in terms of meth. On the other hand, there is, what, 150,000 kilograms of meth here, so the government's theory he was the kingpin or one of more than one, I mean, that's a long shift from I just do marijuana, a few convictions, to having him up here as the kingpin, the leader, whatever, to where he gets at 29 years of age, he gets life sentence for these packings. So just help me hone in, I mean, where's the real sledgehammer that or even somewhere where in the hierarchy, but to, you know, where he's really the person driving this deal has been done it, that when you go to the guidelines, you know, you get these multiple life sentences. But just basically, obviously, he did take the stand. He claimed he was a marijuana dealer. The jury had the fact that whatever he sent from California by the time it got to Mississippi was methamphetamine. He can pretend he was a marijuana dealer all he wants, but he was a meth dealer. He may have dealt with marijuana too, but he was a meth dealer. And he was the source of supply for significant quantities of meth that were being distributed in Mississippi. And was there evidence, and I want you to keep going with what you're saying, but was there evidence from the other end in terms of, you know, his supply of the meth, or is it just the circumstances? The mailings and so forth, was there any evidence on that end, wherever he was, connecting him to getting it to Paxson, that kind of smoking gun evidence? The record was not developed as to where he was getting the meth in California, okay? So that, but it did focus on the money going to California that would go to him through these various means. He had, you know, half a dozen people that he would deal with, both in the distribution end of it, who are all the co-conspirators plus Hawkins, uh, and then, and then you've got the people who were obviously involved in the money end, who were sending the money back to California, and we had testimony from, from both of them. I assume the case was made on both ends, so is this DEA and the FBI, or the FBI, is normally like the case agents, you know, when this genesis is working the case from that end, have got their notions of, you know, sort of that, or is it just the Mississippi end, in terms of where it's flowing down through and sort of working backwards, you understand? I don't, no, it involved, uh, uh, there were witnesses from both ends, but the witnesses from California were primarily on the, uh, the financial end, uh, people who were, were, were tasked by Mays to, uh, uh, get money from Mississippi in exchange that was being sent back here to pay for the, for the, for the meth, uh, and, and then people in Mississippi who were involved in the distribution, and then there was a, there was a takedown of sorts, uh, that when, uh, Hawkins was arrested at the casino in York Court, uh, and, uh, then this fellow Jackson kept on dealing with Mays after that, so there, there wasn't, it, it, it did continue on, and you did have shipments, uh, going back, uh, from California to Mississippi. And the, um, so we definitely had plenty, plenty of, uh, uh, folks involved, uh, sufficiently for him to take on the leadership role as, as, uh, Judge Osreden applied. Judge Osreden, despite the fact that there was no, uh, objection to the sentencing guidelines, as he, he's, as he always does, he gave a very careful, uh, rendition of the basis for each one of the, the guidelines enhancements, uh, and gave a very thoughtful presentation about why this defendant, despite his youth and his not having maybe as big a record, uh, was somebody who should be properly held accountable, because the guidelines were so serious, uh, as to the amount, the magnitude of the math that was involved. If there are no further questions, we're just going to break. No, hang on one second. I think, I think I've asked you about the sentencing piece, and you've explained, uh, the calculations. No, I think that, okay, thank you. All right, Mr. Holder, you've preserved your rebuttal time. Let me first say that, um, I, I did my best to try to understand everything that Mr. Cleveland was, was saying. There was a little bit of a, not really an echo, but just, it was a little bit difficult. Well, I told you when you got up here that it's hard to hear in this place. You didn't believe me until you went back and you couldn't hear. But I, I believe he did say that nobody was specifically asked about the, the reason for, or the motives in their testimony. Uh, and I would just, uh, assert that they denied rehearsing anything, whether it be about motive or collusion or rehearsing or, or, um, or anything at all. Uh, and he also argued that, you know, this was cured by Mr. Crosby's, uh, argument to the jury. Well, let's take you where you want to go. Let's assume arguendo, you know, some kind of error, but go back to where I start. Given all the other evidence the government has laid out, et cetera, et cetera, even if we say error, as you noted in the case cited, you know, harmless error. So he says, we're going to look at what his testimony, what they were able to get out on cross-examination. So, you know, it's arguably we wouldn't find error, but let's assume we say, well, it was some kind of error there. But what do you do with the weight of this other evidence in terms of us reversing on that? I think just looking at Mr. Minor's proposed testimony itself, that the jury was not allowed to fully hear. Um, I'm just, I'm going to read through a few sentences in the proffer. Question, they said there was no ice involved. Yes, sir. They said there was going to be a lot of ghost dope. I'm sorry. And he said they call it ghost dope. And he asked what ghost dope means. And he said with dope that's not real, they were going to put dope on him to give him a good amount of time and get their time back. And I think in context, when you don't allow something like that in, uh, when you have these multiple co-defendants who, uh, you know, as far as time frame goes throughout this case, had different stories. You know, one of them would say that Mr. Mays was involved in this August transaction. Mr. Mays was involved in that. Um, so there's, there's contradictions within their own testimony. All right, I got you. Let's do this. Madam Clerk, give him, uh, two minutes. Now let's shift to sentencing. Make your best case. You've got a client with a life sentence. I think we've got your argument about the, you know, the co-defendants and so forth. We've heard the government, you know, make your best case on the sentencing so we don't miss whatever, you know, your best shot is on it. I mean, 250,000 kilograms of meth, not marijuana, shipped, the connections, the mailings, et cetera. I mean, that's your uphill sled. He's 29, but the guidelines are what they are. Assuming Holguin and the issue is preserved, and we're not dealing with plain error, how does that still get you to home plate? As most drug cases, the quantity kind of drove everything. You know, it's obviously not unique to this, to this case. Um, you know, the arguments are that the quantities were dramatically increased based upon, uh, you know, stuff that we deem Mr. Mays, even from some of the co-defendants admitted that he was not involved with. Uh, that's number one. All the maximum enhancements were enforced against Mr. Mays. Importation, four-level legal organizer, um, obstruction of justice, uh, you know, to drive his total offense. I don't want to pin you down. I hear you. But it looks like in reading what I read, Judge Olsen went very slow, very carefully, very methodically. There's no objections about being cut off. The guidelines are where they are. Yes, you might want him to come out somewhere different, but where is the reversible error, given the stuff? I mean, that's just kind of a bullseye question. As far as the substantive reasonableness, you know, just looking at the history and characteristics of Mr. Mays, he had no prior, um, but your real beef is the guidelines and the enhancements, right? Excuse me, I'm sorry, I didn't understand. Your real beef is the import of the guidelines and the enhancements on your client on this fact. Right. Not so much that the trial judge erred vis-à-vis the application, is it? Well, it's more of the way the guidelines were calculated. I mean, he imposed a guideline sentence. There's no, there's no argument. There's no . . . Well, that's what I'm saying. I didn't read in it that there's somebody saying the Provision Office inaccurately, incorrectly calculated what they calculated based on what the guidelines drive. There's no argument saying, presumed to preserve error, that the district court went way off the map in terms of what was there. So, if you've got this grid here and you've got that error there, that's why I say, you know, what's kind of the drive home to say within our case law that the judge reversibly erred with what was in front of him, et cetera. You follow what I'm saying? That's why I say it with the guidelines and enhancements of what the district judge . . . how he applied them, not that the judge erred in the application. Does that make . . . do you follow me? I understand. And then, you know, I can see that any sentence within the guideline range is a presumptively reasonable sentence. I understand. I just think that looking at Mr. Mays' history and case jurisdiction, no prior drug offenses, there was a marijuana conviction in contest to that arrest as the basis of one of the arguments in this appeal, that he was given two extra points on his criminal history, which we deem was . . . we contend was an error because the conviction happened after any of the dates of the offenses in the indictment. And I concede that there was no specific objection to any of these arguments in the trial court, other than just a general objection to the sentence itself. All right. Well, we have your argument. For obvious reasons, given the magnitude of the sentence, I want to give you ample opportunity, but as well, a segue to say, your court-appointed counsel didn't try the case, and we appreciate you and all our court-appointed counsel take the cases on and ably advocate on behalf of their clients. And yours is still in the brief in the argument today. I appreciate your responses to the court's questions and your representation of your client. Thank you, and this is my first foray in front of the circuit. I'm honored to be here, and I appreciate y'all's time. You did good. You're educated about the sound system, right? All right. Thank you. Thank you, counsel, for that. All right.